UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD PATTON,<br><br>                    Plaintiff,<br><br>v.<br><br>FIRST LIGHT PROPERTY<br>MANAGEMENT, INC., a California<br>Corporation, JALEH HANASSAB, an<br>individual, DOES 1 through 20, inclusive,<br><br>                    Defendants. | Case No.: 14-cv-1489-AJB-WVG<br><br>**ORDER DENYING PLAINTIFF'S<br>MOTION FOR NEW TRIAL**<br><br>(Doc. No. 166) |

This matter comes before the Court on Plaintiff Donald Patton's ("Patton") motion for new trial, which was heard on September 28, 2017. (Doc. Nos. 166, 180.) Defendants First Light Management, Inc., and Jaleh Hanassab (collectively referred to as "Defendants") oppose the motion. (Doc. No. 173.) As will be explained in more detail below, the Court **DENIES** Patton's motion for new trial.

///
///
///
///
///

**BACKGROUND**

Patton asserts claims for housing discrimination under the Fair Housing Act, Fair Employment and Housing Act, and the Unruh Act. (Doc. No. 166-1 at 6.)[1] Patton is a Native American member of the Olgala Sioux tribe. (Doc. No. 43-1 ¶ 1.) Through his declaration, Patton also establishes that he was diagnosed with schizophrenia in 2004 and is a recovering alcoholic, though he has not consumed alcohol or non-prescription drugs since December 2005. (*Id.* ¶¶ 1, 2.)

In October of 2007, Patton applied for and was approved as a candidate for Section 8 housing, sponsored by the United States Department of Housing and Urban Development ("HUD"), the San Diego IMPACT program, and the San Diego Housing Commission. (Doc. No. 15 ¶ 14.) Thereafter, Patton entered into a lease with Defendant Jaleh Hanassab ("Hanassab"), to reside at 1440 Lincoln Avenue, Apartment 10 in San Diego ("the Property"). (Doc. No. 43-3 at 92–100.)

For the first several years, Patton states that he resided at the Property without issue, however in late 2011, he contends that he became the subject of discrimination by Mr. Lonnie and Mrs. Darleen Thomas—independent contractors of First Light who performed maintenance and management duties beginning in June 2011. (*Id.* at 83; Doc. No. 38-3 at 50–51; Doc. No. 43-1 ¶ 8.) One interaction was when Patton told Mr. Thomas that he was Native American, and Mr. Thomas allegedly stated "I would hate to see you with your war paint on." (Doc. No. 38-3 at 51.)

Several other interactions included: (1) in April of 2012 when Mr. Thomas approached Patton and purportedly told him to "fucking move out," (Doc. No. 43-1 ¶ 13); (2) in May of 2012 when Mr. Thomas allegedly told Patton "We don't want your kind here," (Doc. No. 38-3 at 63); and (3) in July of 2012 when Mr. Thomas allegedly gestured

---

[1] Page numbers refer to the CM/ECF page number and not the numbers listed on the original document.

to Patton with a "limp wrist" and in a mock, effeminate manner said, "Oh, honey, you're home," (*Id*. at 52–53).

Beginning in August of 2012, Patton alleges that he was served with a series of improper and unlawful notices to vacate. (Doc. No. 54 at 4.) Patton received the first notice on August 23, 2012, from Mr. Thomas, however the notice did not state a reason for its issuance, and Patton was not informed of why he received the notice. (Doc. No. 43-3 at 122.) On September 11, 2013, Patton was served with another 60-day notice to move out, (*Id*. at 130), and in November of 2013, he received a 90-day notice of termination of tenancy stating that Hanassab was opting out of the Section 8 housing program, (*Id*. at 134).

On June 18, 2014, Patton initiated this lawsuit against Defendants. (Doc. No. 1.) Subsequently, Patton's motion for leave to proceed in forma pauperis was granted. (Doc. No. 4.) On September 29, 2014, Patton filed his amended complaint. (Doc. No. 15.) On October 29, 2014, Defendants filed a motion to dismiss, which was granted in part and denied in part. (Doc. Nos. 16, 22.) Specifically, Patton's causes of action under section 1982 of the Civil Rights Act and the California Disabled Persons Act were dismissed with leave to amend. (Doc. No. 22.) Thereafter, Defendants filed a motion for partial summary judgment on March 22, 2016, (Doc. No. 38), which was denied on August 29, 2016, (Doc. No. 54).

This case then proceeded to trial in March of 2017. (Doc. No. 126.) The trial lasted seven days. (Doc. No. 141.) After deliberating for over a day, the jury came back with a verdict in favor of Defendants. (Doc. No. 143.) The verdict form filled out by the presiding juror checked "No" under the question "Has Plaintiff proved by a preponderance of the evidence that his race was the sole reason for the Defendants' attempts seeking termination of his tenancy?" (Doc. No. 149 at 2.) Under Question 3 "Has Plaintiff proved by a preponderance of the evidence that his race was a motivating factor in Defendants' attempts seeking termination of his tenancy?" the presiding juror checked "Yes." (*Id*.) However, under Question 4 "Have Defendants proved by a preponderance of the evidence that

Defendants' attempts seeking termination of Plaintiff's tenancy were also motivated by a lawful reason?" the presiding juror checked "Yes." (*Id.* at 3.)

On March 31, 2017, Patton filed an ex parte motion for leave to proceed in forma pauperis and waiver of transcript costs, (Doc. No. 151), which the Court granted on April 11, 2017, (Doc. No. 153). On May 24, 2017, Patton filed the instant matter, his motion for new trial and request to alter or amend judgment. (Doc. No. 166.) This Order now follows.

## LEGAL STANDARD

### A.    Motion for a New Trial Under Rule 59

Federal Rule of Civil Procedure ("FRCP") 59(a) provides that a "court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reasons for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotations and citation omitted). Upon a motion for new trial a "district judge [has] the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence . . . ." *See Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). The court's control over a trial is illustrated by the court's *sua sponte* power to grant a new trial on the grounds not alleged by a party. *See* Fed. R. Civ. P. 59(d).

### B.    Grounds for Amending or Altering a Verdict

District courts have "considerable discretion" when addressing motions to amend a judgment under Rule 59(e). *Turner v. Burlington N. Santa Fe R.R Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003). However, "a Rule 59(e) motion is an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.'" *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). Typically, a district court may grant a Rule 59(e)

4

motion where it "is presented with newly discovered evidence, committed *clear error*, or if there is an intervening change in controlling law." *Id*. (citing *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc)).

## DISCUSSION

A.    Patton's Motion is Not Untimely

As a threshold issue, the Court addresses Defendants' contention that Patton's present motion is untimely. (Doc. No. 173 at 12.) A Rule 59[2] motion must be filed no later than 28 days after the entry of judgment. Fed. R. Civ. P. 59(b), (e). The jury found in favor of Defendants on March 24, 2017, and judgment was filed in this case on March 27, 2017. (Doc. Nos. 149, 150.) Thus, Patton's 28 day period for filing a motion for new trial lapsed in late April. Patton filed his motion on May 24, 2017. (Doc. No. 166.)

Based on the foregoing, Defendants are correct that within the parameters of Rule 59, Patton's motion is untimely. Moreover, the Court is cognizant that generally courts do not have discretion to extend the deadline for filing such a motion. *See Tillman v. Assoc. of Apartment Owners of Ewa Apartments*, 234 F.3d 1087, 1089 (9th Cir 2000); *see also Bealer v. Rios*, No. 1:12-cv-01516-DAD-EPG-PC, 2017 WL 915270, at *2 (E.D. Cal. Mar. 7, 2017).

However, the Court notes that on April 11, 2017, the Court on its own initiative, allowed Patton until May 24, 2017, to file his post-trial motions.[3] (Doc. No. 153 at 3.) Consequently, the Court now finds itself in a curious situation as the Court provided Patton an extension of time past the twenty-eight day deadline. However, in an effort to decide this motion on the merits rather than deny it based on the Court's own procedural error, the Court will treat Patton's untimely Rule 59 motion as a motion for relief from judgment

---

[2] Any future reference to "Rule" refers to the Federal Rules of Civil Procedure.

[3] The Court clarifies that Patton did not file a motion for extension of time to file his motion for new trial. Instead, the Court extended the deadline on its own and in response to Patton's numerous transcript requests. (*See generally* Doc. No. 151; Doc. No. 153 at 3.)

under Rule 60(b). *See Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1463 n.35 (9th Cir. 1992) ("An untimely motion for reconsideration is construed as a motion based on Fed. R. Civ. P. 60(b)."); *see also Magarrell v. Mangis*, No. CIV S-04-2634 LKK/DAD P, 2012 WL 4468206, at *3 (E.D. Cal. Sept. 25, 2012) ("The court does have the power to treat an untimely motion for a new trial as a motion for relief from a final judgment under Rule 60(b), and will do so."); *Bailey v. United States*, 250 F.R.D. 446, 448 (D.Ariz. 2008) (interpreting untimely motion for new trial as motion for relief from final judgment under Rule 60(b)). Furthermore, the Court employs Rule 1, and construes the rules so that they be employed by the Court to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Consequently, as a motion under Rule 60(b) "must be made within a reasonable time" and Patton's motion was filed only two months after the jury returned their verdict, Patton's motion is timely.[4] Fed. R. Civ. P. 60(c)(1).

B.    Defendants' Objections

Defendants filed objections to Patton's affidavit and exhibits submitted in support of his motion for new trial on June 15, 2017, as a separate document. (Doc. No. 175.) Specifically, Defendants object to the (1) Durana Affidavit; (2) Lepine Affidavit; and (3) Patton's flow chart. (*Id*.)

First, the Court notes that per Judge Battaglia's Civil Case Procedures "[o]bjections relating to the motion should be set forth in the parties' opposition or reply. No separate

---

[4] Patton argues that his motion was timely under the "Unique Circumstances" doctrine, which states that a review of an untimely appeal is warranted as Patton relied in good faith upon a judicial action—this Court's order extending the time to file post-trial motions—which indicated to him that his right to appeal would be timely. (Doc. No. 176 at 5 (*see In re Mouradick*, 13 F.3d 326, 329 (9th Cir. 1994)). However, the Supreme Court made clear that "the timely filing of a notice of appeal in a civil case is a jurisdictional requirement." *Bowles v. Russell*, 551 U.S. 205, 214 (2007). Accordingly, it held that it had "no authority to create equitable exceptions to jurisdictional requirements" and thus the "use of the 'unique circumstances' doctrine [was] illegitimate." *Id*.

statement of objections will be allowed." Civ. Case. Proc. II.A. Thus, Defendants' objections are procedurally defective. However, finding that the majority of Defendants' objections mirror the Court's concerns, the Court will address each objection in turn.

First, Defendants state that the Durana Affidavit is inadmissible and should be stricken based entirely on Rule 606(b)(1). (Doc. No. 175 at 2–4.) In response, Patton asserts that the affidavit falls under an exception to the foregoing exclusionary rule. (Doc. No. 177 at 2.)

For clarity, Ms. Durana's affidavit states that (1) she believes that Patton was the victim of racial discrimination by Defendants; (2) after she confirmed her verdict with the Court, she asked the Court what would have happened if she refused to sign the verdict form as she was unaware that she could refuse to join in the jury's verdict; (3) she did not receive sufficient instruction about any options she had as a juror who did not agree with the majority; (4) she joined the jury's verdict and signed the verdict form because she was convinced of two things—first that by finding that race was a motivating factor, the jurors had established wrong doing on the part of Defendants and two, she was assured by her fellow jurors that Patton would get treatment for the harm he was inflicted through governmental services; (5) Ms. Durana observed the jury's disregard for the Court's limiting instruction about hearsay as to the verbal complaints—the jury took the complaints as true and that formed the basis for the determination that Defendants had legal grounds to terminate Patton's lease; (6) several of the jurors agreed that Patton should win the case, but only be awarded nominal damages because they did not want to support a "money grab"; and (7) the jury discussed two matters that were not presented at trial—that Patton would receive services from the government and that since he was registered as a tribal member, he collects casino money—both of these statements were given "significant consideration" by the jury. (Doc. No. 166-2 at 2–3.)

Federal Rule of Evidence 606 states that

> During an inquiry into the validity of a verdict or indictment, a
> juror may not testify about any statement made or incident that

occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). Three exceptions to Rule 606 exist that allow a juror to testify about the validity of a verdict: (1) "extraneous prejudicial information was improperly brought to the jury's attention"; (2) "an outside influence was improperly brought to bear on any juror"; or (3) "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

Fundamental to our judicial system's administration of justice is a fair and impartial jury. *United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981). A jury should reach a verdict that is based solely upon the evidence admitted at trial, "unaffected by extrinsic facts." *Id*. A juror's communication of extraneous information implicates the Confrontation Clause. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). If a court determines that a juror has improperly brought extraneous information to the jury's attention, the inquiry must then focus on whether "there is a reasonable possibility that the extrinsic material could have affected the verdict." *United States v. Keating*, 147 F.3d 895, 900 (1988) (citing *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir. 1988)).

Given the clear language of the rule, the Court finds that Ms. Durana's affidavit represents exactly what Rule 606 seeks to exclude. Patton's motion for new trial based on the affidavit at issue seeks to demonstrate that the jurors found for Defendants as they took the complaints for the truth of the matter asserted and believed that Patton would receive casino money or financial assistance from the government. However, "parsing how jurors considered the evidence or their mental states while hearing testimony is exactly what . . . the plain text of Rule 606(b) seek to prevent." *United States v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015); *see also United States v. Davis*, 960 F.2d 820, 828 (9th Cir. 1992) (describing as "meritless" a motion for a new trial based on a juror's statement in an interview that "[f]rom the first day I knew [the defendant] was guilty").

8

Thus, as the various statements in Ms. Durana's affidavit very clearly fit within the confines of Rule 606's exclusionary rule, the central issue hinges on whether the affidavit is subject to Rule 606's various exceptions. Patton steadfastly argues that the affidavit should be accepted as Ms. Durana is seeking to testify to external matters that tainted the verdict. (Doc. No. 177 at 2.) Specifically, Patton argues that the statements that Patton would receive governmental assistance and casino money are plain objective facts that are extraneous prejudicial information. (*Id.* at 4–5.) The Court disagrees with Patton.

For purposes of this Order, our analysis of Rule 606(b) is guided by the Supreme Court case: *Tanner v. United States*, 483 U.S. 107 (1987). In *Tanner*, the Court addressed the admissibility of a juror affidavit that argued that jurors drank alcohol, smoked marijuana, conducted drug deals, slept throughout the trial, and ingested cocaine. *Id.* at 115–16. The Supreme Court highlighted that "the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Id.* at 117. The Court then listed several cases that embodied the "extraneous influence" exception. In *Mattox v. United States*, 146 U.S. 140, 148–49 (1892), the Supreme Court held admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence. Additionally, in *Parker v. Gladden*, 385 U.S. 363, 365 (1966), the court allowed juror testimony about various comments a bailiff made about the defendant to a juror. Further, in *Remmer v. United States*, 347 U.S. 227, 228–30 (1954), the court concluded that a bribe offered to a juror was extraneous information. In sum, the Supreme Court stated that Rule 606 was meant to protect the "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople . . . ." *Tanner*, 483 U.S. at 121.

Here, the Court determines that the nature of the statements Patton seeks to introduce through Ms. Durana's affidavit do not fall within Rule 606(b)'s exception for extraneous information. *See Leung*, 796 F.3d at 1035 ("[T]he salient inquiry is the 'nature of the allegation.'") (citation omitted). The Court does not dispute that references to casino

9

money or governmental assistance were not produced at trial nor admitted into evidence. Rather, the Court stresses that it is not persuaded that the statements are "external" matters defined as including "publicity and information related specifically to the case the jurors are meant to decide . . . ." *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014). Instead, the Court finds that the statements more properly reflect "the general knowledge, opinions, feelings, and bias that every juror carries into the jury room." *Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989). In other words, the statements more properly display the jurors' preconceived notions about Native American gaming benefits and the financial situation of Native Americans generally. In San Diego County there are a number of prominent Native American Tribes who are well-known for their casinos and community activities in addition to name sponsorship on local sports facilities. Thus, the affidavit is not admissible under Rule 606(b)'s exception for extraneous information. *See Casey v. United States*, 20 F.2d 752, 754 (9th Cir. 1927) (holding that it is without question that "in their deliberations jurors more or less generally recall experiences in their own lives, and if new trials were commonly granted for such a reason there would be no end to litigation.").

Furthermore, the Court diverges with Patton on three distinct points made in his opposition brief. First, in contrast to Patton's contentions, the Court does not find *Gibson v. Clanon*, 633 F.2d 851 (9th Cir. 1980), relevant to the instant matter. In *Gibson*, a juror consulted a medical encyclopedia to investigate different morphine dosages. *Id*. at 853. Here, there is no evidence that any juror accessed a book or website to determine that Patton would receive government or casino money. Next, the Court disagrees with Patton that Ms. Durana's affidavit does not speak to the mental processes of the jurors. (Doc. No. 177 at 4.) In direct contrast, Ms. Durana's affidavit clearly states that the "governmental services [Patton] receives was a significant consideration taken into account in [the jury's] deliberations" and the statement that Patton receives casino money was "also given significant considerations by the jury." (Doc. No. 166-2 ¶ 9.)

Finally, the Court does not find that Ms. Durana's affidavit should be considered for mistakes on the verdict form. The jury was clearly instructed that:

> It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

(Doc. No. 148 at 36.) Moreover, at no time did Ms. Durana inform the Court that she did not agree with the verdict or did not understand her rights as a juror who did not agree with the majority. Furthermore, Ms. Durana was individually polled by the Court Room Deputy about whether she agreed with the verdict, to which she answered in the affirmative. (Doc. No. 166-1 at 12.)

On a final note, though not directly argued by Patton, the Court finds it important to note that it does not find that the statements about casino money and government services rises to the level of "racial prejudice" to warrant admission. In *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), the Supreme Court found two affidavits by two jurors describing a number of biased statements made during jury deliberations to be troubling. For example, juror "H.C." told other jurors that "he believed the defendant was guilty because, in [H.C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." *Id*. at 862. In addition, H.C., "stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated 'I think he did it because he's Mexican and Mexican men take what they want.'" *Id*. Further, a juror recounted that H.C. said that "he did not find petitioner's alibi witness credible because, among other things, the witness was 'an illegal.'" *Id*. The Supreme Court ultimately reversed the Court of Appeals' affirmation of the district court's denial of defendant's motion for new trial based on the affidavits. *Id*. at 871.

11

In coming to its conclusion, the Supreme Court held that the type of racial bias or hostility that will justify setting aside the no-impeachment bar is one where the "jurors made statements exhibiting overt racial bias that cast[s] serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id*. at 869. More specifically, "[t]o qualify, [as an exception to Rule 606(b)], the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id*. However, the Supreme Court made clear that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry."[5] *Id*.

Here, the juror's statements about government and casino money do not display a blatant racial bias against Native Americans similar to the racial stereotypes present in *Pena-Rodriguez*. Nor is there evidence that any of the jurors depended on a racial stereotype in coming to their verdict. Further, in *Pena-Rodriguez*, the Supreme Court found that H.C. "encouraged other jurors to join him in convicting on that bias[,]" which is not a situation Ms. Durana specifies in her affidavit. *Id*. at 870. In contrast, the Court finds that the jurors in the present matter were sensitive to Patton's situation, but found that the racial discrimination he suffered was not enough to return a verdict in favor of Patton. This is clearly demonstrated by the jury verdict form that stated that they found that race <u>was a motivating factor</u> in Defendants' attempts to terminate his lease, but in the end also found that Defendants had a <u>lawful</u> reason to terminate his tenancy. (Doc. No. 149 at 2–3.) The Court holds firm in its desire to eliminate racial bias in the jury system, however, Ms. Durana's affidavit fails to demonstrate a racial animus that warrants admission of her affidavit against Rule 606(b)'s no impeachment rule.

Accepting Patton's invitation to consider Ms. Durana's affidavit would be in direct contravention to Supreme Court precedent and would invite overwhelming consequences

---

[5] The Court notes that *Pena-Rodriguez* was a criminal case. However, the Court addresses this issue to further clarify that Ms. Durana's affidavit is inadmissible as evidence.

for the finality of jury verdicts. Accordingly, Ms. Durana's affidavit is excluded. Additionally, as the affidavit is not sufficient on its face to require a new trial or to set aside the verdict, and a evidentiary hearing was not necessary.[6]

Next, Defendants argue that Ms. Amy Lepine's, Patton's counsel, affidavit is "nothing more than a second argument of the evidence" and should thus be excluded. (Doc. No. 175 at 6.) Patton retorts that the affidavit is properly admitted as the matters that Ms. Lepine included in her affidavit are matters that are not contained in the record. (Doc. No. 177 at 7.) The Court frankly disagrees with Patton.

Puzzlingly, in direct contrast to Patton's assertion that the affidavit does not encompass any materials that are not on the record, the Court finds that the nine page affidavit clearly generalizes the complaint and the actions leading up to the institution of this action, discusses the various motions brought during discovery, and repeats Patton's arguments in the present action. (*See generally* Doc. No. 166-3.) The Court highlights that in his opposition to Defendants' objections, Patton agreed that "[a]ffidavits are considered to support a motion where the <u>record does not contain</u> the matters upon which a party moving for a new trial relies." (Doc. No. 177 at 7 (citation omitted) (emphasis added).) Thus, as Ms. Lepine's affidavit is simply a reiteration of subjects reflected on the docket and in the moving papers, it is properly excluded from evidence.

Finally, Defendants argue that the Flow Chart attached to Patton's motion as Exhibit 1 is hearsay, lacks foundation, and is inadmissible as evidence. (Doc. No. 175 at 7.) Patton retorts that the chart is meant to visually assist the Court and does not contain any actual evidence. (Doc. No. 177 at 8.) The Court chooses to disregard this flow chart as it is not based on evidence clearly in the record, does not cite to the record, and ultimately is an argumentative visual aid that is improper for the Court to consider.

---

[6] When faced with a challenge to a verdict based on juror misconduct, the Court may decide to conduct an evidentiary hearing, subpoena the jurors, or rely on juror affidavits. *See Hard*, 870 F.2d at 1461. The Court has considerable discretion in connection with the procedure it chooses. *See United States v. Saya*, 247 F.3d 929, 935 (9th Cir. 2001).

Based on the foregoing, the Court **GRANTS** Defendants' objections. (Doc. No. 175.)

C.     Motion for Relief from Judgment

As already discussed, to decide this motion on the merits, the Court will consider Patton's motion for new trial as a motion for relief from judgment under Rule 60(b). Rule 60 states that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:"

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud [], misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

Patton seeks a new trial on three grounds: (1) the weight of the evidence is contrary to the verdict; (2) for reasons of unfairness that occurred at trial; and (3) to prevent a miscarriage of justice. (*See generally* Doc. No. 166-1.) The Court will evaluate whether any of these grounds merits relief under Rule 60(b).

### a.     Weight of the Evidence is Not Contrary to the Verdict

Patton's motion under this first claim rests on multiple layers of contentions. Mainly, Patton seeks to demonstrate that the jury's finding of a lawful reason to terminate his tenancy was unreasonable because (1) repositioning was not a lawful or credible reason; (2) written complaints were not a lawful reason and were highly prejudicial; (3) verbal complaints do not support a lawful reason; and (4) terminating section 8 was not a lawful reason nor was the testimony credible. (Doc. No. 166-1 at 16–19.) The Court will analyze

this assertion under Rule 60(b)(1), which allows for relief from a final judgment due to a "mistake."[7]

Based on a meticulous analysis of the record, the Court finds that the jury made no mistake when it found that there were other non-discriminatory and lawful reasons to terminate Patton's tenancy. In coming to its conclusion, the Court will focus its attention to Patton's second and third points listed above.

At trial, numerous written and verbal complaints were testified to by various witnesses. For example, a written complaint about Patton's alleged drug use in his unit was produced. (Doc. No. 166-5 at 123:7–11.) Additionally, Mr. Trevor Henson[8] ("Henson") testified that there were several verbal complaints passed onto Mr. and Mrs. Thomas in regards to loud banging, constant noise, and screaming coming from Patton's unit at all hours of the day. (*Id*. at 125:1–2.) Mr. Henson stated that the majority of these verbal complaints were not written down as those who made the complaints were supposedly afraid of Patton's aggressive behavior. (*Id*. at 125:3–6.)

Patton's addendum to his lease with the San Diego Housing Commission states that the owner "may not terminate any tenancy except upon the following grounds. (1) Material non-compliance with the lease; (2) Material failure to carry out obligations under any State landlord and tenant act; or (3) Other good cause." (Doc. No. 166-16 at 3.) Moreover, Patton's residential lease with Hanassab stated that the "Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs . . . ." (Doc. No. 43-3 at 94.) As such, based on the witness testimony at trial and the various provisions in Patton's leases, the jury was

---

[7] The Court notes that no per se rule has been established that governs what constitutes a "mistake" under Rule 60(b)(1). *See Int'l Allied Printing Trades Ass'n. v. Am. Lithographers, Inc.*, 233 F.R.D. 554, 555 (N.D. Cal. 2006).

[8] Mr. Henson is the corporate secretary for Defendants, and took over the management of Patton's apartment complex in May of 2011. (Doc. No. 156 at 3:4–7; 5:12–24.)

15

presented with evidence that provided that Mr. Henson, as the decision maker, had good cause to choose not to re-new Patton's lease.

Patton attempts to diminish the significance of the written complaints by arguing that these complaints were admitted over Patton's hearsay objections and were highly prejudicial. (Doc. No. 166-1 at 17.) Moreover, as to the verbal complaints, Patton seeks to demonstrate that though there were around ten verbal complaints made in the time span between June of 2011 to September of 2013, these complaints were never passed onto Mr. Henson, the decision maker. (*Id*. at 17–19.) To clarify, Patton asserts that the first 60 day notice was at the suggestion of Mr. Thomas, but that he testified that he never had a conversation with Mr. Henson about Patton and that though Mr. Henson testified that he heard complaints about Patton from Mr. and Mrs. Thomas, Mr. Zatarain, and Ms. Keihne, both Mr. Thomas and Ms. Keihne[9] testified that they never spoke with Henson about Patton. (*Id*. at 17.) Further, Patton contends that the witnesses who testified to these complaints lacked any credibility. (*Id*. at 18–19.)

Regrettably, not only does Patton fail to cite to the record to support the majority of these arguments, but an inspection of Mr. Henson's testimony at trial directly contradicts Patton's assertions. The Court illuminates that Henson testified that (1) in regards to the 2012 sixty-day notice, Mr. Thomas made the suggestion to terminate Patton's tenancy based on two written complaints from Mr. Jamerson and several verbal complaints, (Doc. No. 156 at 28:18–25); (2) that Mr. Henson was aware of a noise complaint between Mr. Zatarain and Patton, (*Id*. at 30:10–31:2); (3) that he believed that he had good cause to terminate Patton's tenancy, (*Id*. at 45:1–15); (4) that he received the complaint from Jamerson about Patton's alleged drug use, (*Id*. at 122:7–12); (5) that he had received numerous complaints from Mr. and Mrs. Thomas, and Mr. Zatarain about constant noise and screaming coming from Patton's unit that were taken into consideration before issuing

---

[9] Ms. Keihne and Mr. Zatarain were both managers of Patton's apartment complex. (Doc. No. 166-9 at 4:10–22; 5:1–5.)

a sixty day notice, (*Id*. at 123:22–124:6); (6) that he discussed these foregoing verbal complaints with both Mr. and Mrs. Thomas, and Mr. Zatarain, (*Id*. at 125:22–126:2); (7) he had knowledge of verbal complaints about Patton screaming in the courtyard, (*Id*. at 126:9–18); (8) that he had tenants who complained that they feared Patton, (*Id*. at 126:19–25); (9) that he discussed the verbal complaints with Mr. and Mrs. Thomas and Mr. Zatarain after they informed him of them, (*Id*. at 127:3–11); (10) that he received the second complaint from Mr. Jamerson in regards to issues he had with Patton, (*Id*. at 130:3–14); and (11) that he learned of the verbal complaints against Patton from communicating with his team on a weekly basis, (*Id*. at 140:10–18). Additionally, Ms. Keihne testified that all of the complaints she received from other sources were relayed to Mrs. Thomas, (Doc. No. 166-9 at 53:13–17), and Mrs. Thomas testified that all of the complaints received by her were passed onto First Light, (Doc. No. 166-7 at 15:4–8). Based on this testimony, Patton's arguments that the various complaints were never passed onto the decision maker at First Light are meritless.

Moreover, Patton's contentions regarding the credibility of the various witnesses misses the mark. Presently, the truth of the complained activity is not the point. Instead, the point is what Henson, the decision maker, believed. Furthermore, at trial the jury was presented with this testimony and asked to make a determination as to whether they found these witnesses credible and based on the verdict, they did. Now presented with this post-trial motion, "the Court may not substitute its own view of the evidence for that of the trier of fact—rather, to grant a new trial the Court must reach the definite and firm conviction that a mistake has been committed by the trier of fact." *Beckway v. DeShong*, No. C07-5072 TEH, 2012 WL 1355744, at *4 (N.D. Cal. Apr. 18, 2012) (internal quotation marks omitted). Here, the evidence provided by Patton does not clearly and completely allow this Court to find that the jury made a mistake.

In short, despite any contradictions, inconsistencies, and seeming disconnection to other witnesses, the jury had sufficient evidence to believe that Henson believed he had "good cause" to not renew Patton's lease and to return a defense verdict. *See Josephs v.*

*Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006) ("The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."). Thus, Patton's arguments and the evidence presented does not justify relief under Rule 60(b)(1).[10]

### b.   It was Not Unreasonable for the Jury to Find that the Harassment was Not Severe and/or Pervasive

Patton contends that the jury's finding that the weight of the evidence demonstrated that the harassment Patton supposedly endured was not severe or pervasive was unreasonable in light of the purportedly ongoing hateful comments against Patton, attempts to gain entry into his unit, and repeated unlawful attempts to terminate his tenancy. (Doc. No. 166-1 at 20.) The Court will similarly evaluate this claim under Rule 60(b)(1), which allows relief from judgment based on a "mistake."

In considering whether the discriminatory conduct was "severe or pervasive," the Court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance . . . ." *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (internal quotation marks and citation omitted).

Here, the alleged discriminatory comments made against Patton began in late 2011. In total, there are four comments at issue: (1) "I would hate to see you with your war paint on"; (2) "Fucking move out"; (3) "We don't want your kind here"; and (4) "Oh, honey, you're home." (Doc. No. 38-3 at 51–53, 63; Doc. No. 43-1 ¶ 13.) Thereafter, beginning in 2012, Patton alleges that he was served multiple unlawful notices to vacate. These notices

---

[10] As the Court determines that the jury had sufficient evidence to find that Defendants had a lawful reason to terminate Patton's tenancy based on various verbal and written complaints, the Court will not delve into Patton's other arguments. It should be enough to say that Patton's arguments about repositioning, Section 8 termination, and lease law procedural mistakes as pretext did not carry the day. Indeed, Defendants admitted their errors on Section 8 termination and handling of the lease termination procedures and documents.

came on August 23, 2012, September 11, 2013, and November 2013. (Doc. No. 43-3 at 122, 130, 132.) The November 30, 2013 notice informed Patton that Hanassab would be opting out of Section 8 Housing. (*Id*. at 134.)

The September 11, 2013 notice was a 60-day notice to move out. (*Id*. at 130.) At the end of the 60-day period, Mrs. Thomas allegedly demanded entrance into Patton's apartment to conduct a "walkout" inspection. (Doc. No. 43-1 at 6.) When Patton declined to let her in, Mrs. Thomas supposedly forced her way into the unit, along with Mr. Thomas. (*Id*. at 6–7.) On February 25, 2014, Hanassab filed an unlawful detainer action against Patton. (Doc. No. 43-3 at 140.)

The Court finds that though these allegations are alarming, they do not rise to the threshold level of severity or pervasiveness. In the record, there is at most four allegedly discriminatory statements in a span of three years, and three notices of termination of tenancy beginning in late 2012. Thus, looking to the alleged discriminatory actions as a whole, the Court can conclude that the jurors were not mistaken when they found that the harassment was not "pervasive or severe." *See Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) ("[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."); *see also Etter v. Veriflo Corp.*, 67 Cal. App. 4th 457, 467 (1998) (acknowledging that severe or pervasive conduct requires more than "occasional, isolated, sporadic, or trivial" acts); *King v. Bd. of Regents of University of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir. 1990) ("Although a single act can be enough, . . . generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident.").

Patton attempts to contend that per *Kyllo v. United States*, 533 U.S. 27 (2001), the racially charged statements by Patton's landlord are "severe" as they are occurring in one's home, which is the place where a person is supposedly to feel the most safe. (Doc. No. 176 at 7.) However, Patton's characterization of the holding in *Kyllo* demonstrates a faulty and almost bizarre understanding of the law. The Supreme Court in *Kyllo* was dealing with the

14-cv-1489-AJB-WVG

use of sense-enhancing technology to gather any information regarding the interior of a home, and concluded that the use of thermal imaging to measure heat emanating from a home was a "search." 533 U.S. at 27. It is unequivocally clear that the facts in *Kyllo* are not present in the instant matter and that the holding in *Kyllo* does not support Patton's arguments.

Consequently, the jury was not mistaken in concluding that the alleged harassment was not severe or pervasive. Thus, Patton's contentions do not justify overturning the judgment under Rule 60(b)(1).

### c.      Unfairness that Occurred at Trial

Patton argues that based on Defendants' counsel's misconduct during trial and the introduction of improper character evidence, a new trial should be granted. (Doc. No. 166-1 at 22.) Defendants retort that Patton did not lose his ability to completely present his case and thus his motion on this point should be denied. (Doc. No. 173 at 19.) The Court will evaluate this contention under Rule 60(b)(3), which allows for relief from a final judgment due to "misrepresentation" and "misconduct by an opposing party."

To prevail under the theory that the trial was not fair to the moving party, the moving party "must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party from fully and fairly presenting the defense." *De Saracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 880 (9th Cir. 2000). Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *In re M/V Peacock*, 809 F.2d 1403, 1405 (9th Cir. 1987).

Patton points to several instances to demonstrate that Defendants' supposed misconduct at trial resulted in unfairness to him: (1) when Defendants attempted to introduce into evidence emails that had been excluded by Magistrate Judge Gallo; (2) using Ms. Keihne's testimony to attack Patton's character; and (3) Defendants' use of their closing argument to prejudice the jury by stating that Patton's original complaint didn't "say anything about racial discrimination." (Doc. No. 166-1 at 23–25.)

As to Patton's first contention, Patton points to Mr. Lauter's, Defendants' counsel, attempt to bring in emails while discussing the 2013 sixty-day notice, reference to an email Ms. Hu, an employee of First Light Property received, which was excluded by Patton's Rule 37 motion, and a complaint by Jose Ontiveros about Patton, all excluded by Magistrate Judge Gallo. (Doc. No. 166-5 at 145:11–146:25; Doc. No. 166-6 at 18:16–20:13; Doc. No. 166-7 at 25:2–16.)

The Court agrees with Patton that whether purposefully or on accident, Defendants carried out various undertakings in direct contravention to Magistrate Judge Gallo's orders. Nevertheless, Patton's motion suffers from a glaring oversight—he has failed to provide clear and convincing evidence that he was prevented from fully and fairly presenting his case. Instead, Patton argues in a conclusory manner that Defendants' conduct "severely prejudiced the jury against Patton," that the numerous objections Patton had to make during trial made it seem as if he had "something to hide as someone who was trying to cover up his bad character traits," and that "counsel's misrepresentations lead the jury to believe that [Patton did] not have a real claim for race discrimination." (Doc. No. 166-1 at 25–26.) However, these arguments amount to nothing more than speculative and self-serving assumptions about unknown variables, including how the jury was perceiving the evidence. Thus, as Patton has failed to demonstrate that Defendants' alleged misconduct resulted in a judgment that was not fairly procured, Rule 60(b)(3) relief is not justified. *See Saracho*, 206 F.3d at 880.

Similarly, Patton's contention that Defendants obtained their verdict through their character assassination of Patton also amounts to nothing more than conjecture. Ms. Keihne testified about various complaints she had heard about Patton from other tenants, her own negative encounters with him on the premises, as well as how she felt intimidated by his presence. (Doc. No. 166-1 at 24.) Patton then attempts to argue that because Ms. Keihne looked "directly at the jury and appeared to make her statements in earnest" and that "she appeared to be young and affluent" that her statements made more of an impact on the jury and prejudiced their verdict. (*Id.* at 26.) However, Patton's irrelevant arguments again

21

avoid the main point of demonstrating that Patton was deprived of his right to fully and fairly present his case. Though, Patton seeks to demonstrate that Keihne's demeanor may have swayed the jury's verdict, this is Patton's depiction of what happened at trial and Patton's portrayal of how the jury could have viewed Ms. Keihne's testimony. This does not in and of itself demonstrate that Patton deserves relief from the judgment based on Defendants' misconduct. Indeed, the jury was instructed on their duty to judge the credibility of the witnesses and their "manner while testifying" e.g. their demeanor, as one factor for evaluation. The jury finding this witness credible, without more, does not compel relief for Patton in this motion. It should also be noted, that Patton offered his own testimony about his conduct on the premises and brought in his own witnesses—at least one of whom actually supported Defendants' testimony, and Patton's counsel thoroughly argued credibility of the witnesses and her outrage about the "character assassination."

In sum, Patton's conclusory and irrelevant arguments do not establish that he did not have the chance to object or to cross-examine Ms. Keihne or that Ms. Keihne's testimony altered the jury's verdict. *See Phillips v. City of Fairfield*, No. CIV. S-04-0377 FCD PAN, 2007 WL 754207, at *4 (E.D. Cal. Mar. 8, 2007) (finding no attorney misconduct as defendants still had the opportunity to "rehabilitate the witnesses"); *see also Howard v. Nat'l R.R. Passenger Corp.*, No. C 05-4069 SI, 2007 WL 2854382, at *2 (N.D. Cal. Sept. 27, 2007) ("[P]laintiff has not shown that the failure to produce the documents and privilege log affected the verdict.").

Next, in regards to Patton's contentions that Defendants' statement during closing arguments misstated what Mr. Henson had testified to and thus prejudiced the jury, the Court again disagrees. Mr. Henson testified that Patton's initial complaint that he filed pro per was titled "housing discrimination." (Doc. No. 166-8 at 23:8–13.) However, during closing arguments, Mr. Lauter stated that "the original complaint drafted by [Patton] . . . it [] doesn't say anything about racial discrimination . . . nowhere in the complaint does it say 'I was discriminated.'" (Doc. No. 166-12 at 5:3–9.)

Again, Patton has made clear that Defendants made many missteps at trial. However, it is difficult for the Court to believe that Patton was prejudiced by Defendants' statements as the Court provided the jury a curative instruction immediately following Mr. Lauter's statement and Patton's objection. The Court stated:

> I am going to correct a misstatement that drew an objection, and I think it's unfair to simply disregard the comment. This so-called original complaint is not in evidence. Mr. Henson was asked about it. On cross-examination he admitted the title of the document was housing discrimination. He admitted the document contained Plaintiff's race and claims of harassment. You will recall that, I trust, and I don't want counsel's misstatement to alter your memory. And merely sustaining the objection I don't think was enough of a cure. So I am reminding you of that testimony, as the court has leave to do.

(Doc. No. 166-12 at 6.)

Thus, in contrast to Patton's arguments, the Court finds that its severe and strong limiting instruction prevented Defendants' conduct from "sufficiently permeat[ing] [the] entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir. 1983) (internal quotation and citation omitted). Moreover, the Court is not persuaded that Patton was unable to fully and fairly present his case. Patton clearly objected to Defendants' statement during closing arguments, and the Court adequately responded with a curative instruction that put Defendants in a heavily negative light. *See Aubert v. Robles*, No. 1:10-cv-00565-MJS (PC), 2014 WL 2979413, at *3 (E.D. Cal. July 1, 2014) (holding that under Rule 60(b)(3) the moving party must demonstrate that the "alleged misrepresentation prevented him from fairly presenting his case."); *see also Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641, 646 (D.Or. 2000) (finding that the district judge's instruction to the jury to disregard the testimony did not prevent defendant from fully and fairly presenting its case).

Accordingly, the Court does not find that Patton's various arguments under this claim warrant overturning the judgment under Rule 60(b)(3).

### d. Miscarriage of Justice

Patton's final assertion is that his motion for new trial should be granted to prevent a miscarriage of justice. (Doc. No. 166-1 at 26.) Specifically, Patton contends that as the jury found that Defendants did violate the housing law, they should not prevail on the rest of the claim. (*Id.*) The Court will analyze this assertion under Rule 60(b)(6), which relieves a party from a final judgment for "any other reason that justifies relief." *See United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993) ("Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice.").

Patton's arguments seemingly ignore the plain meaning of the law and seeks to re-argue his case and his motion without any reference to the record or relevant case law. (Doc. No. 166-1 at 28.) Though Patton is correct that the jury found that race was a "motivating" factor in Defendants' attempt to terminate his tenancy, (Doc. No. 149 at 2), Patton again ignores the fact that the jury also found that Defendants had proven by a preponderance of the evidence that Defendants' attempts to terminate Patton's tenancy was also motivated by a "lawful reason[,]" (*Id.* at 3), and "that Defendants would have made the same attempts seeking termination of Plaintiff's tenancy notwithstanding his race." (*Id.*) Thus, looking towards the plain meaning of the term, Patton has failed to establish that a "miscarriage of justice" has occurred. *See People v. Ramirez*, 143 Cal. App. 2d 554, 557 (1956) ("The latest expression of the Supreme Court stating the test for determining whether error has resulted in a miscarriage of justice is '[t]hat a miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.") (citation omitted). Consequently, the Court finds no reason to relieve the judgment under Rule 60(b)(6).

///

**D.     Patton's Motion to Alter or Amend the Judgment**

Patton proposes that the judgment should be altered or amended under section 59(e) because there was clear error on three different points: (1) character assassination; (2) counsel's misrepresentation of the evidence; and (3) the improper verdict form. (Doc. No. 166-1 at 28–29.) Defendants assert that there is no basis to alter or amend the judgment as there was no clear error. (Doc. No. 173 at 23.)

As previously employed, the Court will again analyze Patton's Rule 59(e) motion under Rule 60(b). Moreover, as the majority of these arguments were already discussed in the previous section and the Court does not find any reason to repeat itself, the Court's analysis will be concise, and to the point.

First, as to Patton's claims that Ms. Keihne's statements were nothing more than a character assassination and that Defendants mischaracterized the evidence, the Court will evaluate these claims under Rule 60(b)(3), which relieves a party from a final judgment based on misrepresentation or misconduct by an opposing party.

In reference to the introduction of the complaints that Ms. Keihne testified to, the Court notes that the objective of allowing these complaints, that were later passed onto the management at First Light, were meant to demonstrate the decision maker's state of mind in making the decision to not renew Patton's lease. (*See* Doc. No. 166-9 at 12:1–10.) Second, as already discussed, Defendants' alleged misconduct during closing argument was remedied when the Court provided the jury a strong limiting instruction. Thus, the Court finds these two assertions, in light of the applicable legal standards, fail to demonstrate clear error or that Patton should be relieved from final judgment based on Rule 60(b)(3). *See S.E.C. v. Pattison*, No. C-08-4238-EMC, 2011 WL 2293195, at *2 (N.D. Cal. Jun. 9, 2011) ("While courts have generally not defined what constitutes clear error under Rule 59(e), case law indicates that clear error should conform to a very exacting standard— e.g., a court should have a clear conviction of error.") (citation and internal quotation marks omitted).

Finally, as to Patton's arguments in regards to the verdict form, the Court will analyze this claim under the lens of Rule 60(b)(1), which allows for relief based on "mistake." Patton asserts that Question 4 and 5 of the verdict form are inaccurate as they are not required by FEHA. (Doc. No. 166-1 at 30.) Defendants contend that Patton did not object to the verdict form on the record, nor did he object to the verdict form during the various discussions they had with the Court about the form. (Doc. No. 173 at 24.) Thus, Defendants assert that Patton has not followed the procedures as set forth in Rule 51 that states that an objection is timely when the Court gives "the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51.

While it is true that those questions were not part of Patton's elements for recovery under FEHA, lawful motives and limitation of remedies were asserted defensively by the Defendants. These questions were logically consistent to follow the finding that race was "a motivating factor" (but not sole). (Doc. No. 149 at 2.) Further, the questions were necessary as the jury was instructed on Limitation of Remedies from the State of California Model Jury Instruction, CACI 2512, which was approved by the parties without objection.

Next, the Court agrees that Patton has not followed the procedures as set out in Rule 51 and thus this argument is procedurally defective. *See Boston Scientific Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1110 (N.D. Cal. 2008) ("A court may grant a motion for a new trial where the jury instructions were erroneous or inadequate, so long as the moving party demonstrates that it made a request for alternative instructions that could have corrected the 'fatal flaws' in the instructions that were given.") (citation omitted). Patton mounts that pursuant to *Younis Bros. & Co. v. CIGNA Worldwide Ins. Co.*, 899 F. Supp. 1385, 1391 (E.D.Pa. 1995), an erroneous jury instruction does not stand simply because a party failed to object during a trial. (Doc. No. 176 at 10.) However, not only is this case not dispositive, but the court was analyzing a charge that was not objected to under the minimum quantum of evidence under Rule 50. *Younis Bros.*, 899 F. Supp. at 1391.

More importantly, and most puzzling, is the fact that Question 4 and 5 were provided to the Court by Patton. (*See* Doc. No. 106-3 at 2; Doc. No. 149 at 3.) Thus, ultimately, Patton wishes to argue that it was his mistake in drafting the jury instructions, but it is now the Court's responsibility to remedy the issue or that it was the Court's mistake to accept the verdict form from Patton. However, the Court highlights that a great deal of time was spent working on this special verdict form with both counsels during the course of the trial. In total, four draft verdict forms were created with input from both Patton and Defendants. (Doc. Nos. 132, 133, 139, 140.) Thus, as Patton failed to object to the jury forms, and in fact provided the questions word for word, this argument is waived. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001) (holding that to the extent that alleged errors "are not claims about the way the jury answered the form's interrogatories, [but] are allegations that errors were built into the form itself," they are waived if no objection is raised "until after the jury has rendered its verdict and [is] discharged."); *see also Motorola Inc. v. J.B. Rogers Mech. Contractors*, 177 F'Appx 754, 756 (9th Cir. 2006) (holding that as the defendant did not object to the jury form but actually participated in its drafting, his objections to the form verdict were waived).

Moreover, relief under Rule 60(b)(1) is also not warranted as Rule 60(b)(1) "is not intended to remedy the effects of a litigation decision that a party later comes to regret[.]" *See Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097, 1101 (9th Cir. 2006) (explaining the Ninth Circuit's decision that "[f]or purposes of subsection (b)(1), parties should be bound by and accountable for the deliberate actions of themselves and their chosen counsel.").

Finally, at the hearing on this motion, Patton's counsel conceded that Questions 4, 5, and 6, reflected the affirmative defenses and were not incorrect statements of law at all.

///
///
///
///

27

## **CONCLUSION**

As discussed in depth above, the Court **DENIES** Patton's motion for new trial.

**IT IS SO ORDERED**.

Dated: November 15, 2017

Hon. Anthony J. Battaglia
United States District Judge